United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 5, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-10837
3:02cv34-M

LYRICK STUDIOS, INC.,

Plaintiff-Counter Defendant-Appellee

v.

BIG IDEA PRODUCTIONS, INC.,

Defendant-Counter-Claimant-Appellant.

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT 1 8 2005

CLERK, U.S. DISTRICT COURT
By_____
Deputy

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, DENNIS, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

Appellee Lyrick Studios, Inc. ("Lyrick") contends that appellant Big Idea Productions, Inc. ("Big Idea") breached their agreement under which Big Idea provided Lyrick with an exclusive license to distribute children's cartoon programs. Lyrick sued over this breach, and the jury found in its favor. Big Idea appeals, arguing that Lyrick cannot satisfy the requirement that all transfers of copyright (such as exclusive licenses) must be in writing and signed by the transferor. Because there is no sufficient writing here, we reverse the judgment.

Phil Vischer founded Appellant Big Idea Productions, Inc. to finance and market "VeggieTales," a computer-animated Christian-

1

themed children's cartoon he created, featuring the characters
Bob the Tomato and Larry the Cucumber.  Originally, Big Idea
independently distributed VeggieTales to members of an
organization called the Christian Bookstores Association ("CBA").
The programs were successful, and Big Idea eventually entered
into a contract with a third party to distribute to the CBA.
VeggieTales' sales continued to grow.

With this success, Big Idea wanted to sell its products to a
larger audience.  To do this, Big Idea began negotiating with
Lyrick Studios, which had experience with its own successful
children's programs.  In February 1997, Tim Clott, Lyrick's CEO,
sent Big Idea the first of three documents that are critical to
this case.  This document was a proposal for distribution of
VeggieTales to the "general marketplace."  It ended with the
caveat that "for both of our protection, no contract will exist
until both parties have executed a formal agreement."  Big Idea's
vice president of licensing and development, Bill Haljun, sent
the second critical document—a fax that listed several issues
still to be decided.  The next day, the parties discussed the
issues in a phone call and agreed to resolve them.  Haljun faxed
Clott a few days later, noting that "Phil is ecstatic."

Shortly afterwards, Lyrick prepared a 16-page contract.
This draft agreement was never signed.  In fact, several draft
contracts (and suggested revisions to the drafts) were sent back

2

and forth over the years.  There were several sticking points, including DVD distribution rights, rights to stuffed animals, the possibility of a "key man" provision, and even the term of the contract.  The parties agree that no formal "long-form" contract was ever signed.

Despite lacking a formal signed contract, in March 1998, Lyrick began distributing VeggieTales videocassettes.  The cassettes were immediately successful; both parties made a significant profit from the relationship.

The negotiations over a written contract continued until June 1999, when the fourth and final draft was prepared by Lyrick.  Like the other drafts, this one was never signed.  At some point around this time, the parties' relationship became strained.  One point of contention involved the rights to stuffed animals, or as the parties referred to them, plush.  The parties eventually signed an agreement ("the plush letter") transferring plush rights in VeggieTales from Lyrick to Big Idea.

In March 2001, Lyrick was acquired by HIT Entertainment, a London-based children's entertainment company, but it continued to distribute VeggieTales.  In December 2001, Big Idea informed Lyrick that it was going to use a new distributor.  In response, Lyrick sued Big Idea.

This lawsuit is primarily based on Lyrick's claims that Big Idea breached its exclusive license/distribution agreement by

3

entering into an agreement with the new distributor.  During discovery, Big Idea produced a document that Lyrick now contends is the third crucial document——a November 1997 internal memorandum by Bill Haljun.  Haljun wrote this memo in response to a Big Idea employee's question about the 10-year term with Lyrick.  In his memo, Haljun replied that "[w]e agreed over the phone to his contract . . . . I would say that we have an agreement in force."  Lyrick had not seen this internal memorandum before litigation.

The case proceeded to trial.  After the close of Lyrick's evidence, Big Idea moved for judgment as a matter of law, arguing that any contract for an exclusive license of a copyrighted work, such as VeggieTales, had to be in writing.  The district court denied this motion, and the case went to the jury.  The jury found that there had been a contract and that Big Idea had breached it.  As a result, the jury awarded Lyrick damages of $9,071,973 for lost profits on videocassettes and DVDs.  The district court entered judgment for this amount, along with $750,000 in attorney's fees.  The judgment amount also included $14,540 in damages for breach of the plush letter; Big Idea agreed to this $14,540 award before trial and does not appeal it.  The court also permitted Lyrick to collect on a $500,000 bond Big Idea posted when it obtained a preliminary injunction preventing Lyrick from distributing VeggieTales products.  Big Idea now

4

appeals the district court's denial of its motion for judgment as a matter of law.  We review this ruling de novo.  *Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238, 248 (5th Cir. 2005).  Judgment as a matter of law is proper when "there is no legally sufficient basis for a reasonable jury to find for [a] party on [an] issue."  FED. R. CIV. P. 50(a)(1).

Under § 204(a) of the Copyright Act, "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).  A grant of an exclusive license is considered a "transfer of copyright ownership."  17 U.S.C. § 101 (2005).  Section 204(a)'s requirement, while sometimes called the copyright statute of frauds, is in fact different from a statute of frauds.  *Konigsberg Int'l, Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994).  Rather than serving an evidentiary function and making otherwise valid agreements unenforceable, under § 204(a) "a transfer of copyright is simply 'not valid' without a writing."  *Id.*  The writing in question "doesn't have to be the Magna Charta; a one-line pro forma statement will do."  *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990).  Nor does the writing have to contain any particular language.  *Radio-Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922,

5

927 (9th Cir. 1999) ("No magic words must be included in a
document to satisfy § 204(a)."). It must, however, show an
agreement to transfer copyright. *Id*; *see also Playboy Enters.,
Inc. v. Dumas*, 53 F.3d 549, 564 (2d Cir. 1995).[1] An after-the-
fact writing can validate an agreement from the date of its
inception, at least against challenges to the agreement by third
parties. *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586,
591 (7th Cir. 2003); *Magnuson v. Video Yesteryear*, 85 F.3d 1424,
1429 (9th Cir. 1996); *Imperial Residential Design, Inc. v. Palms
Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995); *Eden Toys,
Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir.
1982). The parties both agree that the issue whether the
parties' undisputed writings satisfy § 204(a) is one of law. *Cf.
Television Espanola*, 183 F.3d at 924 (deciding the issue on a
motion for summary judgment); *Konigsberg*, 16 F.3d at 356(deciding
the issue on a motion to dismiss).

The writing requirement serves several purposes. First, it
ensures that a copyright will not be inadvertently transferred.
*Effects Assocs.*, 908 F.2d at 557. Second, it "forces a party who
wants to use the copyrighted work to negotiate with the creator

---

[1] In *Playboy*, the Second Circuit held that a statement
reading "payee acknowledges payment in full for the assignment to
Playboy Enterprises, Inc. of all right, title and interest in and
to the following items: [a description of a painting followed]"
was insufficient to transfer copyright under § 204(a). 53 F.3d
at 560.

6

to determine precisely what rights are being transferred and at
what price." *Id.* Third, it provides a guide for resolving
disputes; the parties can look to the writing to determine
whether a use is improper. *Id.* In this way, the writing
requirement "enhances predictability and certainty of copyright
ownership—'Congress'[s] paramount goal' when it revised the
[Copyright] Act in 1976." *Id.* (quoting *Community for Creative
Non-Violence v. Reid*, 490 U.S. 730, 749 (1989)).

Here the parties dispute whether Big Idea and Lyrick have a
writing that meets § 204(a)'s requirement. Lyrick contends that
§ 204(a) is satisfied with a series of documents—the letters
between Haljun and Clott and the internal Haljun memorandum. Big
Idea responds that the letters were just proposals and never
showed a final agreement. Big Idea also argues that Haljun's
internal memo is not the kind of writing that can satisfy §
204(a).

Resolving this issue requires us to examine the documents.
In the first document—the February 1997 letter from Tim Clott of
Lyrick to Bill Haljun of Big Idea—the opening paragraph
describes the letters contents as "our proposal." The rest of
the letter sets out provisions such as territory, term, rights,[2]

----

[2] Although the "rights" section discussed distribution of
Big Idea programs, Lyrick's letter did not actually state that
the licensing rights were exclusive. An express exclusive
license provision does not appear until the draft long-form
contracts. These long-form contracts were never signed, and

products, and the distribution of proceeds.  The final paragraph
contains some critical language: "If the above terms are
acceptable to you we will begin drafting a formal agreement.  (Of
course, for both of our protection, no contract will exist until
both parties have executed a formal agreement.)"

The second document that Lyrick relies on is Bill Haljun's
faxed response.  The cover sheet for this fax states, "Here is
our agreement to proceed and the remaining issues and
understandings which we need to resolve prior to signing a formal
document."  The faxed letter reads, in part, "We agree to proceed
to formalize this relationship as quickly as possible with
binding agreements, subject to the following clarifications and
additions.  Hopefully, we can resolve these issues promptly and
begin the selling process . . . with the July trade show."  A
list of changes and proposals followed.

The final document is an internal memorandum written by
Haljun in November 1997, over six months after his fax and
directly responding to a concern about the proposed 10-year term.
It describes the parties' negotiations and indicates that, "We
agreed over the phone to his contract and thanked him very much."
In recalling the discussions, Haljun indicates that Big Idea
requested a minimum volume term, but Lyrick did not accept it.
Continuing, the memo states that Big Idea suggested some

---

Lyrick does not rely on them.

8

revisions to the draft long-form contract and that Lyrick had not yet responded to those revisions. The memo concludes with language that Lyrick finds critical:

> Net of all this—when we told Tim Clott we accepted his proposal and we would go forward on that basis, and they have printed catalogs, represented our products and gotten them on television, designed plush, and paid for some research, I would say that we have an agreement in force.

This memo was never sent to Lyrick. In fact, Lyrick saw it for the first time during discovery.

Lyrick contends that these three documents constitute a sufficient written agreement. This assertion raises two primary issues. First, do the first two faxes indicate that they are preliminary in nature or do they contain an actual contract? Second, can Haljun's internal memorandum constitute a "a note or memorandum of the transfer?"

The two 1997 faxes, standing alone, do not show that the parties entered into a final agreement to provide Lyrick with an exclusive license to distribute VeggieTales programs. The February fax from Lyrick indicates that it is a proposal. More importantly, it expressly states, "Of course, for both of our protection, no contract will exist until both parties have executed a formal agreement." Big Idea's fax in response also indicates a lack of finality, providing that, "We agree to proceed to formalize this relationship as quickly as possible with binding agreements." This statement indicates that the fax

9

itself is not a binding agreement. Section 204(a) requires some
language of finality. *Radio Television Espanola*, 183 F.3d at
928. Finally, the continuing debate over the draft long-form
contracts concerned some of the terms in the 1997 faxes (such as
the term and the actual products to be distributed), which
further shows that the faxes were not final contracts.

Lyrick attempts to cure these problems by turning to the
internal Haljun memo. Lyrick argues that "[i]f a writing
*executed* after litigation has commenced is sufficient to satisfy
Section 204(a), a writing executed shortly after the agreement
was reached but *communicated to* the transferee after litigation
has commenced should also be sufficient . . . ." Lyrick thus
tries to fit this case in the line of cases where a post-transfer
writing has met § 204(a)'s requirements. We initially note that
when courts have found the post-deal writing sufficient, the
party challenging the writing has been an alleged infringer who
is an outsider to the deal. *Billy-Bob Teeth*, 329 F.3d at 590
(rival novelty tooth manufacturer); *Magnuson*, 85 F.3d at 1427
(unauthorized distributor); *Eden Toys*, 697 F.2d at 30-31
(manufacturer of a nightshirt with a similar print to licensed
one); *Kaplan Co., Inc. v. Panaria Int'l, Inc.*, No. 96-Civ.-7973,
1998 WL 603225, at *2 (S.D.N.Y. Sept. 11, 1998) (infringing
third-party manufacturer). In that situation, courts are
hesitant to allow an outside infringer to challenge the timing or

10

technicalities of the copyright transfer.  *See Billy-Bob Teeth*,
329 F.3d at 592-93; *Magnuson*, 85 F.3d at 1428-29; *Eden Toys*, 697
F.2d at 36.  That situation is different from the situation here,
where the parties to the alleged contract disagree about whether
a valid agreement actually exists.  Thus, the analysis in these
cases does not apply here, and the cases themselves are not
relevant.

On the other hand, two Ninth Circuit cases are relevant,
each for different reasons.  One, *Konigsberg International, Inc.
v. Rice*, addresses a post-transfer letter in the context of a
dispute between the parties to the alleged contract.  16 F.3d 355
(9th Cir. 1994).  The other, *Radio Television Espanola S.A. v.
New World Entertainment, Ltd.,* concerns a purely internal
memorandum that was not provided to the other party to the
alleged transfer until litigation.  183 F.3d 922 (9th Cir. 1999).

In *Konigsberg*, two movie producers entered into an oral
agreement with the author Anne Rice.  16 F.3d at 356.  Under this
agreement, Rice would create a story, called a "bible," that
"could form the basis for derivative works in various
entertainment media."  *Id*.  Rice would then write a novel based
on the bible and the producers would have two years of movie and
television rights, with an option to extend.  *Id*.  A written
contract was never signed, although Rice delivered the bible and
in exchange received $50,000 from the producers.  *Id*.  Rice then

wrote a successful novel, *The Mummy*, based on the bible, but the producers were not able to exercise their rights. *Id*. The producers claimed that Rice refused their attempts to exercise their option to extend. Therefore they sued. *Id*. The district court dismissed the case because there was no writing that satisfied § 204(a). *Id*. Rice then sent the producers' lawyer a letter stating, "[A]s far as I am concerned, these contracts, though never signed, were honored to the letter." *Id*. The producers tried to use this letter to reopen the case, arguing that this letter met § 204(a)'s writing requirements. *Id*.

The Ninth Circuit disagreed. It determined that Rice's letter was not a sufficient writing:

> Rice's letter was written three and a half years after the alleged oral agreement, a year and a half after its alleged term would have expired and 6 months into a contentious lawsuit. Thus, it was not substantially contemporaneous with the oral agreement. Nor was it a product of the parties' negotiations; it came far too late to provide any reference point for the parties' license disputes. In short, Rice's letter—though ill-advised—was not the type of writing contemplated by section 204 as sufficient to effect a transfer of the copyright to THE MUMMY.

*Id*. at 357. Here, the document is more contemporaneous, entered into during the course of the parties' exchange of the long-form contracts. But *Konigsberg* shows, however, that not all documents referring to the existence of a contract, or even admitting that an agreement existed, will constitute a sufficient note or memorandum of transfer.

12

*Radio Television Espanola* is much closer to the situation here. There a television company, Television Espanola, negotiated an exclusive license with a distributor for certain programs. *Radio Television Espanola*, 183 F.3d at 925. Afterwards, the distributor's negotiating agent drafted and signed an internal memo that listed the terms of the agreement. *Id.* This memo noted that the television company was to prepare the contracts. *Id.* Following this memo, the parties exchanged many letters, faxes, and memos, but never signed a contract. *Id.* Trying to overcome the lack of a formal signed contract, Television Espanola pointed to several different documents it claimed satisfied § 204(a). The first was a fax in which one of the distributor's executives referred to a deal between the parties. *Id.* at 927. The court concluded that this fax did not satisfy the writing requirement:

> Surely, the fax references a deal, but it does not specify anything about that deal or whether that deal is for an exclusive license for the program or for other broadcast rights. A mere reference to a deal without any information about the deal itself fails to satisfy the simple requirements of § 204(a). Without more, the comment in the Garcia fax is merely a part of negotiations rather than an "instrument of conveyance" or "memorandum of the transfer."

*Id.* (citation omitted). The second document that Television Espanola relied on was also a fax. *Id.* This fax, also from the distributor, discussed delivering episodes and concludes "[w]ith nothing further at this time, awaiting the contracts." *Id.* The

13

court concluded that this fax, too, failed to satisfy § 204(a).
*Id.* The court noted that the fax did not discuss the exclusive
license and that "The statement that New World is waiting for the
contracts 'undercuts the hint of finality' that the fax may
otherwise contain." *Id.* at 928 (citing *Valente-Kritzer Video v.
Pinckney*, 881 F.2d 772, 775 (9th Cir. 1989)). Finally,
Television Espanola claimed that two other documents were
sufficient writings. The first document was the distributor's
internal deal memo, describing the deal in some detail, including
the term and the total fee. *Id.* The second document was a fax
from Television Espanola asking the distributor to confirm the
contract. *Id.* Yet the court found that these documents, even
when taken together with the previous ones, did not contain
"language indicating finality." *Id.* Rather, they discussed a
pending contract and negotiations. *Id.*

In rejecting Television Espanola's claim, the Ninth Circuit
noted an additional reason why the internal deal memorandum was
not a sufficient writing. The memo could not have satisfied §
204(a) "because it was never communicated to Television
Espanola." *Id.* at 928 n.6. Again, not all writings will satisfy
§ 204(a)'s requirements.

In general, this case is similar to *Radio Television
Espanola*—preliminary faxes indicated that a contract would be
entered into but did not provide a final contract; an internal

14

memo, never intended to be given to the other party, described
some of the terms.  To be sure, there are also several
differences.  Haljun's internal memo indicates that he agreed
over the phone and that he would say that they had an agreement
in force.  This is somewhat more final than the internal
memorandum in *Radio Television Espanola*.  These differences,
however, do not change the reasoning or the result.

In the end, we conclude that the faxes themselves do not set
out a final signed contract.  By their own language, they are
part of negotiations: Lyrick's initial fax states that "no
contract will exist until both parties have executed a formal
agreement."  Nor do the faxes satisfy the requirements when
combined with Haljun's internal memo.  Like the letter in
*Konigsberg* and the memo in *Radio Television Espanola*, Haljun's
memo is not the kind of memorandum of transfer envisioned by §
204(a).  Satisfying § 204(a)'s writing requirement with a purely
internal memo that was never intended to be provided to Lyrick
would not further the copyright goals of predictability of
ownership.  *See Effects Assocs.*, 908 F.2d at 557.

Lyrick alternatively argues that the parties acted as if
they had a deal for several years, making it unfair for Big Idea
to rely on a "hyper-technical" § 204(a) argument.  The Ninth
Circuit rejected a similar argument in *Konigsberg* when it
required a writing even in the face of ample evidence of an

15

agreement, including that Rice had written the bible and had been paid for it. *Konigsberg*, 16 F.3d at 356.  Section 204(a) requires a writing.  Although Lyrick argues that enforcing this requirement would be unjust, we will not add an exception to the statute.

Attorney's Fees

Lyrick was awarded $750,000 in attorney's fees under TEX. CIV. PRAC. & REM. CODE §38.001, which permits a party to recover its attorney's fees for successful breach of contract claims.  Big Idea asks us to reverse this amount and allow Lyrick to recover a reasonable amount to cover the fees for only the breach of the plush letter claim, not the breach of exclusive contract claim.

Lyrick contends that Big Idea stipulated that $750,000 was reasonable amount of attorney's fees and thus the award should stand in full.  We read the stipulation differently.  In the parties' pretrial order, Big Idea agreed "that $750,000 is a reasonable and necessary amount for Lyrick to have incurred in the prosecution of its breach of contract *claims* in this action in the district court." (Emphasis added).  This stipulation refers to both claims in the aggregate; it says nothing about the reasonable amount of fees for the breach of the plush letter by itself.  We will remand the attorney's fees claim to the district court for a determination of a reasonable amount of fees for Lyrick's $14,540 recovery for breach of the plush letter.

16

Bond

Early in the litigation, Big Idea obtained a preliminary injunction preventing Lyrick from distributing VeggieTales. After trial, the district court determined that this injunction was wrongfully issued and so permitted Lyrick to recover the entire $500,000 bond that been posted by Big Idea when it obtained the injunction.  Big Idea now asks for restitution of that amount because the preliminary injunction was not, in fact, wrongfully issued.  In response, Lyrick does not argue that restitution is unwarranted if its judgment is reversed.  Instead, Lyrick argues that Big Idea does not have standing to request restitution; it contends that only the surety can seek this relief.  Therefore, Lyrick asserts that a claim for restitution of the bond amount can only proceed in a separate lawsuit brought by the surety.

Federal Rule of Civil Procedure 65(c) requires an applicant seeking a preliminary injunction to give security.  If the party chooses to provide security through a bond, Rule 65.1 places certain requirements on sureties providing that bond.  First, each surety is required to submit to the court's jurisdiction. FED. R. CIV. P. 65(c).  Additionally, "[t]he surety's liability may be enforced on motion without the necessity of an independent action."  *Id.*  Lyrick was willing to enforce the surety's liability in just this way.  It would be inconsistent to permit

17

Lyrick to recover the bond amount from the surety without filing
a separate action but then, when Lyrick loses on appeal, to
require the surety to bring a separate lawsuit for restitution of
the same bond amount.   Further, the surety already submitted to
the court's jurisdiction when it posted the bond.   Therefore, we
vacate the order allowing Lyrick to execute on the bond and
remand.

<u>Conclusion</u>

For these reasons, we reverse the judgment of the district
court, vacate the order permitting Lyrick to execute on the bond,
and remand for consideration of attorney's fees and entry of an
order for restitution of the bond.

REVERSED AND REMANDED.

18